Eric Franz (EF 3268)
Law Offices of Eric Franz, P.L.L.C
233 Broadway, Suite 1800
New York, NY 10279
Ph  (212) 384-0260
Fax (212) 406-2313

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------x
INDO TRADE CORP. LTD.,                :      Case No. 07 CIV 6313

                    Plaintiff,        :      **ANSWER AND COUNTERCLAIMS**

            -against-                  :

HANOVER COMPANY STORE, LLC,  :
DOMESTICATIONS LLC, HANOVER
DIRECT, INC., WAYNE GARTEN, and :
STUART FELDMAN

                                      :

            Defendants.                :

                                      :
-----------------------------------------------x

HANOVER COMPANY STORE, LLC,  :
DOMESTICATIONS LLC, HANOVER
DIRECT, INC., WAYNE GARTEN, and :
STUART FELDMAN,

                                      :

            Counterclaimants,          :

            -against-                  :

INDO TRADE CORP. LTD.,                :

            Defendants.                :

-----------------------------------------------x

        Defendants Hanover Company Store, LLC ("The Company Store"),

Domestications, LLC ("Domestications"), Hanover Direct, Inc. ("Hanover"), Wayne

Garten ("Garten"), and Stuart Feldman ("Feldman")(collectively "Defendants") by way of Answer to the Complaint, hereby state as follows:

### JURISDICTION AND VENUE

1.    Defendants admit the allegations contained in paragraph 1 of the Complaint.

2.    Defendants admit the allegations contained in paragraph 2 of the Complaint.

### PARTIES

3.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 3 of the Complaint.

4.    Defendants admit the allegations contained in paragraph 4 of the Complaint.

5.    Defendants admit the allegations contained in paragraph 5 of the Complaint.

6.    Defendants admit the allegations contained in paragraph 6 of the Complaint.

7.    Defendants admit the allegations contained in paragraph 7 of the Complaint.

8.    Defendants admit the allegations contained in paragraph 8 of the Complaint.

### FIRST CAUSE OF ACTION

9.    Defendants admit the allegations contained in paragraph 9 of the Complaint.

10.    Defendants admit the allegations contained in paragraph 10 of the Complaint.

11.    Defendants deny the allegations contained in paragraph 11 of the Complaint.

12.    In response to the allegations contained in paragraph 12, Defendants deny that Hanover summarily terminated the Company Store's Agreement, however, Defendants admit that a letter was sent by Wayne Garten to Plaintiff giving notice of termination.

13.    Defendants deny the allegations contained in paragraph 13 of the Complaint.

14.    Defendants deny the allegations contained in paragraph 14 of the Complaint.

## SECOND CAUSE OF ACTION

15.    Defendants repeat and incorporate their responses to paragraphs 1 through 14 of the Complaint as if set forth fully herein.

16.    Defendants admit the allegations contained in paragraph 16 of the Complaint.

17.    Defendants deny the allegations contained in paragraph 17 of the Complaint.

18.    Defendants deny the allegations contained in paragraph 18 of the Complaint.

19.    Defendants deny the allegations contained in paragraph 19 of the Complaint.

20.     Defendants deny the allegations contained in paragraph 20 of the Complaint.

21.     Defendants deny the allegations contained in paragraph 21 of the Complaint.

## THIRD CAUSE OF ACTION

22.     Defendants repeat and incorporate their responses to paragraphs 1 through 21 of the Complaint as if set forth fully herein.

23.     Defendants admit the allegations contained in paragraph 23 of the Complaint.

24.     Defendants deny the allegations contained in paragraph 24 of the Complaint.

25.     Defendants deny the allegations contained in paragraph 25 of the Complaint.

26.     Defendants deny the allegations contained in paragraph 26 of the Complaint.

27.     Defendants deny the allegations contained in paragraph 27 of the Complaint.

## FOURTH CAUSE OF ACTION

28.     Defendants repeat and incorporate their responses to paragraphs 1 through 27 of the Complaint as if set forth fully herein.

29.     Defendants admit the allegations contained in paragraph 29 of the Complaint.

30.    Defendants admit the allegations contained in paragraph 30 of the Complaint.

31.    Defendants deny the allegations contained in paragraph 31 of the Complaint.

32.    In response to the allegations contained in paragraph 32, Defendants deny that Hanover summarily terminated the Company Store's Agreement, however, Defendants admit that a letter was sent by Wayne Garten to Plaintiff giving notice of termination.

33.    Defendants deny the allegations contained in paragraph 33 of the Complaint.

34.    Defendants deny the allegations contained in paragraph 34 of the Complaint.

### FIFTH CAUSE OF ACTION

35.    Defendants repeat and incorporate their responses to paragraphs 1 through 34 of the Complaint as if set forth fully herein.

36.    Defendants admit the allegations contained in paragraph 36 of the Complaint.

37.    Defendants deny the allegations contained in paragraph 37 of the Complaint.

38.    Defendants deny the allegations contained in paragraph 38 of the Complaint.

39.    Defendants deny the allegations contained in paragraph 39 of the Complaint.

40.    Defendants deny the allegations contained in paragraph 40 of the Complaint.

41.    Defendants deny the allegations contained in paragraph 41 of the Complaint.

## SIXTH CAUSE OF ACTION

42.    Defendants repeat and incorporate their responses to paragraphs 1 through 41 of the Complaint as if set forth fully herein.

43.    Defendants admit the allegations contained in paragraph 43 of the Complaint.

44.    Defendants deny the allegations contained in paragraph 44 of the Complaint.

45.    Defendants deny the allegations contained in paragraph 45 of the Complaint.

46.    Defendants deny the allegations contained in paragraph 46 of the Complaint.

47.    Defendants deny the allegations contained in paragraph 47 of the Complaint.

## SEVENTH CAUSE OF ACTION

48.    Defendants repeat and incorporate their responses to paragraphs 1 through 47 of the Complaint as if set forth fully herein.

49.    In response to the allegations contained in paragraph 49, Defendants admit that there was a contractual relationship between ITC and The Company Store.

50.    In response to the allegations contained in paragraph 50, Defendants admit only to the extent that Defendants received services from ITC in accordance with the scope of performance in the contract.

51.    Defendants deny the allegations contained in paragraph 51 of the Complaint.

52.    Defendants deny the allegations contained in paragraph 52 of the Complaint.

## EIGHTH CAUSE OF ACTION

53.    Defendants repeat and incorporate their responses to paragraphs 1 through 52 of the Complaint as if set forth fully herein.

54.    In response to the allegations contained in paragraph 54, Defendants admit that there was a contractual relationship between ITC and Domestications.

55.    In response to the allegations contained in paragraph 55, Defendants admit only to the extent that Defendants received services from ITC in accordance with the scope of performance in the contract.

56.    Defendants deny the allegations contained in paragraph 56 of the Complaint.

57.    Defendants deny the allegations contained in paragraph 57 of the Complaint.

## NINTH CAUES OF ACTION

58.    Defendants repeat and incorporate their responses to paragraphs 1 through 57 of the Complaint as if set forth fully herein.

59.     In response to the allegations contained in paragraph 59, Defendants admit that there was a contractual relationship between ITC and The Company Store.

60.     In response to the allegations contained in paragraph 60, Defendants admit only to the extent that Defendants received services from ITC in accordance with the scope of performance in the contract.

61.     In response to the allegations contained in paragraph 61, Defendants admit only to the extent that there was a contractual relationship wherein ITC would be paid in accordance with the terms of the contract.

62.     Defendants deny the allegations contained in paragraph 62 of the Complaint.

63.     Defendants deny the allegations contained in paragraph 63 of the Complaint.

## TENTH CAUSE OF ACTION

64.     Defendants repeat and incorporate their responses to paragraphs 1 through 63 of the Complaint as if set forth fully herein.

65.     In response to the allegations contained in paragraph 65, Defendants admit that there was a contractual relationship between ITC and Domestications.

66.     In response to the allegations contained in paragraph 66, Defendants admit only to the extent that Defendants received services from ITC in accordance with the scope of performance in the contract.

67.     In response to the allegations contained paragraph 67, Defendants admit only to the extent that there was a contractual relationship wherein ITC would be paid in accordance with the terms of the contract.

68.    Defendants deny the allegations contained in paragraph 68 of the Complaint.

69.    Defendants deny the allegations contained in paragraph 69 of the Complaint.

## ELEVENTH CAUSE OF ACTION

70.    Defendants repeat and incorporate their responses to paragraphs 1 through 69 of the Complaint as if set forth fully herein.

71.    Defendants admit the allegations contained in paragraph 71 of the Complaint.

72.    Defendants admit the allegations contained in paragraph 72 of the Complaint.

73.    In response to the allegations contained in paragraph 73, Defendants admit only to the extent that Garten was an officer and manager of The Company Store and Domestications during the relevant period.

74.    In response to the allegations contained in paragraph 74, Defendants admit only to the extent that Garten had knowledge that the contract existed but denies that the contract existed at the time of the meeting on April 16, 2007.

75.    Defendants deny the allegations contained in paragraph 75 of the Complaint.

76.    Defendants deny the allegations contained in paragraph 76 of the Complaint.

77.    Paragraph 77 of the Complaint contains no allegations of fact requiring admission or denial as it is a demand for relief, but Defendants deny that the plaintiff is entitled to the relief sought.

## TWELTH CAUSE OF ACTION

78.    Defendants repeat and incorporate their responses to paragraphs 1 through 77 of the Complaint as if set forth fully herein.

79.    Defendants admit the allegations contained in paragraph 79 of the Complaint.

80.    Defendants admit the allegations contained in paragraph 80 of the Complaint.

81.    Defendants deny the allegations contained in paragraph 81 of the Complaint.

82.    Defendants deny the allegations contained in paragraph 82 of the Complaint.

83.    In response to the allegations contained in paragraph 83, Defendants admit only to the extent that Feldman had knowledge that the contract existed but denies that the contract existed at the time of the meeting on April 16, 2007.

84.    Defendants deny the allegations contained in paragraph 84 of the Complaint.

85.    Defendants deny the allegations contained in paragraph 85 of the Complaint.

86.    Paragraph 86 of the Complaint contains no allegations of fact requiring admission or denial as it is a demand for relief, but Defendants deny that the plaintiff is entitled to the relief sought.

## THIRTEENTH CAUSE OF ACTION

87.    Defendants repeat and incorporate their responses to paragraphs 1 through 86 of the Complaint as if set forth fully herein.

88.    Defendants admit the allegations contained in paragraph 88 of the Complaint.

89.    Defendants admit the allegations contained in paragraph 89 of the Complaint.

90.    Defendants deny the allegations contained in paragraph 90 of the Complaint.

91.    Defendants deny the allegations contained in paragraph 91 of the Complaint.

92.    In response to the allegations contained in Paragraph 92, Defendants admit only to the extent that Hanover had knowledge that the contract existed but denies that the contract existed at the time of the meeting on April 16, 2007.

93.    Defendants deny the allegations contained in paragraph 93 of the Complaint.

94.    Defendants admit the allegations contained in paragraph 94 of the Complaint.

95.    Defendants deny the allegations contained in paragraph 95 of the Complaint.

11

96.    In response to the allegations contained in paragraph 96, Defendants deny that Hanover summarily terminated the Company Store's Agreement, however, Defendants admit that a letter was sent by Wayne Garten to Plaintiff giving notice of termination.

97.    Defendants deny the allegations contained in paragraph 97 of the Complaint.

98.    Defendants deny the allegations contained in paragraph 98 of the Complaint.

## FOURTEENTH CAUSE OF ACTION

99.    Defendants repeat and incorporate their responses to paragraphs 1 through 98 of the Complaint as if set forth fully herein.

100.    Defendants deny the allegations contained in Paragraph 100 of the Complaint.

101.    Defendants deny the allegations contained in Paragraph 101 of the Complaint.

102.    Defendants deny the allegations contained in paragraph 102 of the Complaint.

103.    Defendants deny the allegations contained in paragraph 103 of the Complaint.

## FIFTEENTH CAUSE OF ACTION

104.    Defendants repeat and incorporate their responses to paragraphs 1 through 103 of the Complaint as if set forth fully herein.

105.    Defendants deny the allegations contained in Paragraph 105 of the Complaint.

106.    Defendants deny the allegations contained in Paragraph 106 of the Complaint.

107.    Defendants deny the allegations contained in Paragraph 107 of the Complaint.

108.    Defendants deny the allegations contained in Paragraph 108 of the Complaint.

109.    Defendants deny the allegations contained in Paragraph 109 of the Complaint.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails, in whole or in part, to state a claim upon which relief may be granted.

### Second Affirmative Defense

The relief being sought by plaintiff is barred, in whole or in part, by the doctrines of waiver, laches and/or estoppel.

### Third Affirmative Defense

The relief being sought by plaintiff is barred, in whole or in part, by the doctrine of unclean hands.

### Fourth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, for lack of consideration.

### Fifth Affirmative Defense

To the extent that Defendants had any contractual or other obligations whatsoever to plaintiff, they have been complied with.

### Sixth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations.

### Seventh Affirmative Defense

Plaintiff's claims are barred by the doctrine of accord and satisfaction.

### Eighth Affirmative Defense

The relief being sought by plaintiff is barred, in whole or in part, by set-off and/or recoupment.

### Ninth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by its failure to mitigate damages.

### Tenth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the doctrine of comparative negligence.

### Eleventh Affirmative Defense

Neither Feldman nor Garten can be held personally liable for their actions as both were acting in accordance with their role as members and/or employees/agents of a limited liability company.

### COUNTERCLAIMS

Defendants Hanover Company Store, LLC ("The Company Store"), Domestications, LLC ("Domestications"), and Hanover Direct, Inc., ("Hanover") (collectively "Counterclaimants"), by way of Counterclaim against Plaintiff Indo Trade Corp., LTD ("ITC"), allege and say:

### PARTIES

1.    The Company Store is a Delaware limited liability company with an office at 1500 Harbor Blvd, Weehawken, New Jersey 07086.

2.    Domestications is a Delaware limited liability company with an office at 1500 Harbor Blvd, Weehawken, New Jersey 07086.

3.    Hanover is a Delaware limited liability company with an office at 1500 Harbor Blvd, Weehanwken, New Jersey 07086.

4.    Hanover is the sole indirect member of The Company Store and Domestications.

5.    Upon information and belief, ITC is a limited liability company formed and existing under the laws of Hong Kong, with a registered office at 10A, Seapower Industrial Centre, 177 Hoi Bun Road, Kwun Tong, Kowloon, Hong Kong.

### FACTS

6.    On or about June 15, 2004, The Company Store entered into a contract with ITC, appointing ITC as a buying agent on its behalf (the "Company Store Agreement"). Attached hereto as <u>Exhibit A</u>.

7.    On or about June 15, 2004, Domestications entered into a contract with ITC, appointing ITC as a buying agent on its behalf (the "Domestications Agreement"). Attached hereto as <u>Exhibit B</u>.

8.    Paragraph 4(c) of The Company Store Agreement and the Domestications Agreement[1] prohibited ITC from receiving any remuneration for the services ITC rendered from any party other than The Company Store and Domestications.

9.    In paragraph 2(a) of The Company Store Agreement and the Domestications Agreement, ITC represented and warranted that that it would fully and faithfully act as agent of the Counterclaimants.  Thus, pursuant to paragraph 2(a) and (c), ITC was under a duty to inspect and verify that merchandise met the specifications, quality, workmanship as required by the Counterclaimants.

10.    Paragraph 4(b) of The Company Store Agreement and the Domestications Agreement provides that in the event of a breach of a provision of the agreement, ITC would forfeit its' commissions.

11.    On September 7, 2006, Wayne Garten, CEO and President of Hanover Direct, Inc., provided oral notice to ITC that The Company Store Agreement and the Domestications Agreement would not be renewed.

---

[1] The Company Store Agreement and the Domestications Agreement, attached as Exhibit A and B respectively, are identical in their terms and conditions with the exception of the parties' names.

16

12.    On September 15, 2006, Wayne Garten again confirmed by letter that The Company Store Agreement and the Domestications Agreement would not be renewed with ITC.  Attached hereto as <u>Exhibit C</u>.

13.    However, it was agreed by both ITC and Wayne Garten that ITC would continue to discharge its duties for outstanding orders placed prior to September 7, 2006 by Counterclaimants.

14.    Subsequently, Counterclaimants discovered that ITC and/or one or more of its agents and or partners accepted "inquiry fees," kickbacks, bribes and/or other forms of payments from the vendors from whom it purchased merchandise for sale to The Company Store and/or Domestications pursuant to their respective agreements.

15.    JointHappy Textile (Nantong) Co. Ltd ("JointHappy") is a vendor from whom ITC purchased merchandise on behalf of Counterclaimants.

16.    ITC and JointHappy entered into agreements wherein JointHappy was to wire payments to an account at the Industrial and Commercial Bank of China ("ICBC") in the name of Wu Chang Yin (the "Account") within one week of its receipt of payment for the merchandise supplied.

17.    On information and belief, Wu Chang Yin is an agent and/or principal of ITC.

18.    On September 8, 2005, JointHappy wired payments to the Account.

19.    On December 9, 2005, JointHappy again wired additional payments to the Account.

20.    On information and belief, during the term of The Company Store Agreement and the Domestications Agreement, ITC also received payments from

17

HuaDa, another vendor from whom ITC purchased merchandise on behalf of Counterclaimants.

21.    On information and belief, ITC entered into agreements with other vendors that it placed orders with on behalf of The Company Store and Domestications, and received payments from those vendors in violation of The Company Store Agreement and the Domestications Agreement.

## FIRST COUNT

### (Breach of Contract - The Company Store)

22.    Counterclaimant The Company Store repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

23.    At all relevant times, the agreement between The Company Store and ITC was a valid and enforceable contract.

24.    ITC breached the terms of The Company Store Agreement by accepting payments from vendors and failing to perform its obligations of due diligence for quality and workmanship control of merchandise ordered by Counterclaimant.

25.    As a direct and proximate result of ITC's breach of The Company Store Agreement, Counterclaimant has thus been damaged in an amount to be determined at trial.

## SECOND COUNT

### (Breach of Contract - Domestications)

26.    Counterclaimant Domestications repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

27.    At all relevant times, the agreement between Domestications and ITC was a valid and enforceable contract.

28.    ITC breached the terms of the Domestication Agreement by accepting payments from vendors and failing to perform its obligations of due diligence for quality and workmanship control of merchandise ordered by Counterclaimant.

29.    As a direct and proximate result of ITC's breach of the Domestication Agreement, Counterclaimant has thus been damaged in an amount to be determined at trial.

## THIRD COUNT

### (Breach of Contract - Hanover)

30.    Counterclaimant Hanover repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

31.    At all relevant times, Hanover was the sole indirect member of The Company Store and Domestications.

32.    At all relevant times, The Company Store Agreement and the Domestications Agreement were valid and enforceable contracts.

33.    ITC breached the terms of The Company Store Agreement and/or the Domestication Agreement by accepting payments from vendors and failing to perform its obligations of due diligence for quality and workmanship control of merchandise ordered by Counterclaimants.

34.    As a direct and proximate result of ITC's breach of The Company Store Agreement and/or the Domestication Agreement, Counterclaimant has thus been damaged in an amount to be determined at trial.

19

## FOURTH COUNT

## (Breach of Fiduciary Duty/Duty of Loyalty - The Company Store)

35.    Counterclaimant The Company Store repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

36.    As an agent of Counterclaimant, ITC owed a duty of good faith and loyalty to Counterclaimant.    Specifically, ITC was under a duty to find the best competitive prices for Counterclaimant, ensure the highest quality of merchandise, provide truthful and accurate invoices of merchandise purchased on behalf of Counterclaimant and receive compensation solely from Counterclaimant.

37.    However, ITC acted in a manner inconsistent with its agency or trust by accepting payments from vendors.

38.    By accepting payments from vendors, ITC failed to find the best competitive prices.

39.    ITC also failed to ensure it was purchasing the highest quality of merchandise.

40.    Furthermore, ITC failed to provide truthful and accurate invoices for the merchandise it purchased on behalf of Counterclaimant.

41.    Thus, ITC did not exercise the utmost good faith and loyalty in the performance of its duties delineated in The Company Store Agreement.

42.    Accordingly, for the reasons set forth above, ITC breached its fiduciary duty and duty of loyalty owed to Counterclaimant.

43.    As a direct and proximate cause of ITC's breach of loyalty and good faith, Counterclaimant has been damaged in an amount to be determined at trial.

## FIFTH COUNT

### (Breach of Fiduciary Duty/Duty of Loyalty - Domestications)

44.    Counterclaimant Domestications repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

45.    As an agent of Counterclaimant, ITC owed a duty of good faith and loyalty to Counterclaimant.    Specifically, ITC was under a duty to find the best competitive prices for Counterclaimant, ensure the highest quality of merchandise, provide truthful and accurate invoices of merchandise purchased on behalf of Counterclaimant and receive compensation solely from Counterclaimant.

46.    However, ITC acted in a manner inconsistent with its agency or trust by accepting payments from vendors.

47.    By accepting payments from vendors, ITC failed to find the best competitive prices.

48.    ITC also failed to ensure it was purchasing the highest quality of merchandise.

49.    Furthermore, ITC failed to provide truthful and accurate invoices for the merchandise it purchased on behalf of Counterclaimant.

50.    Thus, ITC did not exercise the utmost good faith and loyalty in the performance of its duties delineated in the Domestications Agreement.

51.    Accordingly, for the reasons set forth above, ITC breached its fiduciary duty and duty of loyalty owed to Counterclaimant.

21

52.    As a direct and proximate cause of ITC's breach of loyalty and good faith, Counterclaimant has been damaged in an amount to be determined at trial.

### SIXTH COUNT

### (Breach of Fiduciary Duty/Duty of Loyalty - Hanover)

53.    Counterclaimant Hanover repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

54.    As an agent of The Company Store and Domestications, ITC owed a duty of good faith and loyalty to The Company Store and Domestications. Specifically, ITC was under a duty to find the best competitive prices for The Company Store and/or Domestications, ensure the highest quality of merchandise, provide truthful and accurate invoices of merchandise purchased on behalf of The Company Store and/or Domestications and receive compensation solely from The Company Store and/or Domestications.

55.    However, ITC acted in a manner inconsistent with its agency or trust by accepting payments from vendors.

56.    By accepting payments from vendors, ITC failed to find the best competitive prices.

57.    ITC also failed to ensure it was purchasing the highest quality of merchandise.

58.    Furthermore, ITC failed to provide truthful and accurate invoices for the merchandise it purchased on behalf of The Company Store and/or Domestications.

59.    Thus, ITC did not exercise the utmost good faith and loyalty in the performance of its duties delineated in The Company Store Agreement and/or the Domestications Agreement.

60.    Accordingly, for the reasons set forth above, ITC breached its fiduciary duty and duty of loyalty owed to Counterclaimants.

61.    As a direct and proximate cause of ITC's breach of loyalty and good faith, Counterclaimant has been damaged in an amount to be determined at trial.

## SEVENTH COUNT

### (Faithless Servant - The Company Store)

62.    Counterclaimant The Company Store repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

63.    As an agent of Counterclaimant, ITC owed a duty of good faith and loyalty to Counterclaimant. Specifically, ITC was under a duty to find the best competitive prices for Counterclaimant, ensure the highest quality of merchandise, provide truthful and accurate invoices of merchandise purchased on behalf of Counterclaimant and receive compensation solely from Counterclaimant.

64.    However, ITC acted in a manner inconsistent with its agency or trust by accepting payments from vendors.

65.    By accepting payments from vendors, ITC failed to find the best competitive prices.

66.    ITC also failed to ensure it was purchasing the highest quality of merchandise.

67.    Furthermore, ITC failed to provide truthful and accurate invoices for the merchandise it purchased on behalf of Counterclaimant.

68.    Thus, ITC did not exercise the utmost good faith and loyalty in the performance of its duties delineated in The Company Store Agreement.

69.    Accordingly, for the reasons set forth above, ITC breached its fiduciary duty and duty of loyalty owed to Counterclaimant.

70.    As a direct and proximate cause of ITC's breach of loyalty and good faith, Counterclaimant has been damaged in an amount to be determined at trial.

## EIGHTH COUNT

### (Faithless Servant - Domestications)

71.    Counterclaimant Domestications repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

72.    As an agent of Counterclaimant, ITC owed a duty of good faith and loyalty to Counterclaimant.    Specifically, ITC was under a duty to find the best competitive prices for Counterclaimant, ensure the highest quality of merchandise, provide truthful and accurate invoices of merchandise purchased on behalf of Counterclaimant and receive compensation solely from Counterclaimant.

73.    However, ITC acted in a manner inconsistent with its agency or trust by accepting payments from vendors.

74.    By accepting payments from vendors, ITC failed to find the best competitive prices.

75.    ITC also failed to ensure it was purchasing the highest quality of merchandise.

24

76.    Furthermore, ITC failed to provide truthful and accurate invoices for the merchandise it purchased on behalf of Counterclaimant.

77.    Thus, ITC did not exercise the utmost good faith and loyalty in the performance of its duties delineated in the Domestications Agreement.

78.    Accordingly, for the reasons set forth above, ITC breached its fiduciary duty and duty of loyalty owed to Counterclaimant.

79.    As a direct and proximate cause of ITC's breach of loyalty and good faith, Counterclaimant has been damaged in an amount to be determined at trial.

## NINTH COUNT

### (Faithless Servant - Hanover)

80.    Counterclaimant Hanover repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

81.    As an agent of The Company Store and Domestications, ITC owed a duty of good faith and loyalty to The Company Store and Domestications. Specifically, ITC was under a duty to find the best competitive prices for The Company Store and/or Domestications, ensure the highest quality of merchandise, provide truthful and accurate invoices of merchandise purchased on behalf of The Company Store and/or Domestications and receive compensation solely from The Company Store and/or Domestications.

82.    However, ITC acted in a manner inconsistent with its agency or trust by accepting payments from vendors.

83.    By accepting payments from vendors, ITC failed to find the best competitive prices.

84.    ITC also failed to ensure it was purchasing the highest quality of merchandise.

85.    Furthermore, ITC failed to provide truthful and accurate invoices for the merchandise it purchased on behalf of The Company Store and/or Domestications.

86.    Thus, ITC did not exercise the utmost good faith and loyalty in the performance of its duties delineated in The Company Store Agreement and/or the Domestications Agreement.

87.    Accordingly, for the reasons set forth above, ITC breached its fiduciary duty and duty of loyalty owed to Counterclaimants.

88.    As a direct and proximate cause of ITC's breach of loyalty and good faith, Counterclaimant has been damaged in an amount to be determined at trial.

## TENTH COUNT

### (Unjust Enrichment - The Company Store)

89.    Counterclaimant The Company Store repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

90.    Counterclaimant The Company Store paid ITC commissions on the merchandise it purchased pursuant to The Company Store Agreement.

91.    ITC's acceptance of payments from vendors inflated the costs of the merchandise ITC purchased for Counterclaimant.

92.    Thus, the commissions received by ITC pursuant to The Company Store Agreement were also inflated.

93.    ITC has not reimbursed Counterclaimant for the inflated cost of merchandise and commissions caused by its acceptance of payments from vendors.

94.    As a direct and proximate cause of ITC's acceptance of payments from vendors, it was unjustly enriched at the expense of Counterclaimant in an amount to be determined at trial.

## ELEVENTH COUNT

### (Unjust Enrichment - Domestications)

95.    Counterclaimant Domestications repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

96.    Counterclaimant Domestications paid ITC commissions on the merchandise it purchased pursuant to the Domestications Agreement.

97.    ITC's acceptance of payments from vendors inflated the costs of the merchandise ITC purchased for Counterclaimant.

98.    Thus, the commissions received by ITC pursuant to the Domestications Agreement were also inflated.

99.    ITC has not reimbursed Counterclaimant for the inflated cost of merchandise and commissions caused by its acceptance of payments from vendors.

100.    As a direct and proximate cause of ITC's acceptance of payments from vendors, it was unjustly enriched at the expense of Counterclaimant in an amount to be determined at trial.

## TWELFTH COUNT

### (Unjust Enrichment - Hanover)

101.    Counterclaimant Hanover repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

102.    Counterclaimant Hanover is the sole indirect member of The Company Store and/or Domestications.

103.    The Company Store and Domestications paid ITC commissions on the merchandise it purchased pursuant to The Company Store Agreement and Domestications Agreement, respectively.

104.    ITC's acceptance of payments from vendors inflated the costs of the merchandise ITC purchased for Counterclaimants.

105.    Thus, the commissions received by ITC pursuant to The Company Store Agreement and/or the Domestications Agreement were also inflated.

106.    ITC has not reimbursed Counterclaimant for the inflated cost of merchandise and commissions caused by its acceptance of payments from vendors.

107.    As a direct and proximate cause of ITC's acceptance of payments from vendors, it was unjustly enriched at the expense of Counterclaimant in an amount to be determined at trial.

## THIRTEENTH COUNT

### (Conversion - The Company Store)

108.    Counterclaimant The Company Store repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

109.    By accepting payments from vendors, ITC misappropriated a business opportunity belonging to Counterclaimant.

110.    Counterclaimant has a possessory right to the payments received from the vendors superior to that of ITC.

111.    ITC has unlawfully retained and interfered with Counterclaimant's superior rights to the payments.

28

112.    As a direct and proximate cause of ITC's conversion of the payments from the vendors, Counterclaimant has suffered losses in an amount to be determined at trial.

## FOURTEENTH COUNT

### (Conversion - Domestications)

113.    Counterclaimant Domestications repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

114.    By accepting payments from vendors, ITC misappropriated a business opportunity belonging to Counterclaimant.

115.    Counterclaimant has a possessory right to the payments received from the vendors superior to that of ITC.

116.    ITC has unlawfully retained and interfered with Counterclaimant's superior rights to the payments.

117.    As a direct and proximate cause of ITC's conversion of the payments from the vendors, Counterclaimant has suffered losses in an amount to be determined at trial.

## FIFTEENTH COUNT

### (Conversion - Hanover)

118.    Counterclaimant Hanover repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

119.    By accepting payments from vendors, ITC misappropriated a business opportunity belonging to Counterclaimant.

120.    Counterclaimant has a possessory right to the payments received from the vendors superior to that of ITC.

121.    ITC has unlawfully retained and interfered with Counterclaimant's superior rights to the payments.

122.    As a direct and proximate cause of ITC's conversion of the payments from the vendors, Counterclaimant has suffered losses in an amount to be determined at trial.

### SIXTEENTH COUNT

### (Fraud - The Company Store)

123.    Counterclaimant The Company Store repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

124.    The invoices, submitted by ITC to Counterclaimant for payment, overstated the cost and/or value of the merchandise provided by ITC because its acceptance of payments from vendors inflated the price of the merchandise it purchased.

125.    Counterclaimant relied on the fraudulent statements contained in the invoices and paid the invoices according to their terms.

126.    Counterclaimant's reliance of ITC's fraudulent misrepresentations caused it to substantially overpay for the merchandise provided by ITC.

127.    As a direct and proximate cause of ITC's fraud, Counterclaimant was damaged in an amount to be determined at trial.

## SEVENTEENTH COUNT

## (Fraud - Domestications)

128.    Counterclaimant Domestications repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

129.    The invoices, submitted by ITC to Counterclaimant for payment, overstated the cost and/or value of the merchandise provided by ITC because its acceptance of payments from vendors inflated the price of the merchandise it purchased.

130.    Counterclaimant relied on the fraudulent statements contained in the invoices and paid the invoices according to their terms.

131.    Counterclaimant's reliance of ITC's fraudulent misrepresentations caused it to substantially overpay for the merchandise provided by ITC.

132.    As a direct and proximate cause of ITC's fraud, Counterclaimant was damaged in an amount to be determined at trial.

## EIGHTEENTH COUNT

## (Fraud - Hanover)

133.    Counterclaimant Hanover repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

134.    The invoices, submitted by ITC to The Company Store and/or Domestications for payment, overstated the cost and/or value of the merchandise provided by ITC because its acceptance of payments from vendors inflated the price of the merchandise it purchased.

135.    The Company Store and/or Domestications relied on the fraudulent statements contained in the invoices and paid the invoices according to their terms.

136.    The Company Store and/or Domestication's reliance of ITC's fraudulent misrepresentations caused it to substantially overpay for the merchandise provided by ITC.

137.    As a direct and proximate cause of ITC's fraud, Counterclaimant was damaged in an amount to be determined at trial.

## NINETEENTH COUNT

### (Setoff - The Company Store)

138.    Counterclaimant The Company Store repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

139.    The payments received by ITC from vendors are the property of Counterclaimant, or alternatively, represent damages suffered by Counterclaimant as a result of ITC's breach of contract, breach of its duty of loyalty, conversion, and/or fraud.

140.    Accordingly, Counterclaimant is entitled to setoff from any judgment obtained by ITC, in this case, the payments received from vendors by ITC in an amount to be determined at trial.

## TWENTIETH COUNT

### (Setoff - Domestications)

141.    Counterclaimant Domestication repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

142. The payments received by ITC from vendors are the property of Counterclaimant, or alternatively, represent damages suffered by Counterclaimant as a result of ITC's breach of contract, breach of its duty of loyalty, conversion, and/or fraud.

143. Accordingly, Counterclaimant is entitled to setoff from any judgment obtained by ITC, in this case, the payments received from vendors by ITC in an amount to be determined at trial.

## TWENTY FIRST COUNT

### (Setoff - Hanover)

144. Counterclaimant Hanover repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

145. The payments received by ITC from vendors are the property of Counterclaimant, or alternatively, represent damages suffered by Counterclaimant as a result of ITC's breach of contract, breach of its duty of loyalty, conversion, and/or fraud.

146. Accordingly, Counterclaimant is entitled to setoff from any judgment obtained by ITC, in this case, the payments received from vendors by ITC in an amount to be determined at trial.

## TWENTY SECOND COUNT

### (Declaratory Judgment - The Company Store)

147. Counterclaimant The Company Store repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

148.   If Counterclaimant knew of ITC's breach of contract, breach of loyalty and good faith, unjust enrichment, conversion, and fraud, Counterclaimant would have terminated The Company Store Agreement as of the date of such breach.

149.   Accordingly, Counterclaimant is entitled to a declaratory judgment declaring that The Company Store Agreement is void as of the date of such breach and, therefore, all compensation paid to ITC by Counterclaimant and vendors as of the date of such breach must be returned to Counterclaimant.

### TWENTY THIRD COUNT

### (Declaratory Judgment - Domestications)

150.   Counterclaimant Domestications repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

151.   If Counterclaimant knew of ITC's breach of contract, breach of loyalty and good faith, unjust enrichment, conversion, and fraud, Counterclaimant would have terminated the Domestications Agreement as of the date of such breach.

152.   Accordingly, Counterclaimant is entitled to a declaratory judgment declaring that the Domestications Agreement is void as of the date of such breach and, therefore, all compensation paid to ITC by Counterclaimant and vendors as of the date of such breach must be returned to Counterclaimant.

### TWENTY FOURTH COUNT

### (Declaratory Judgment - Hanover)

153.   Counterclaimant Hanover repeats and realleges the allegations set forth in the preceding paragraphs of this Counterclaim as if fully set forth herein.

154. If The Company Store and/or Domestications knew of ITC's breach of contract, breach of loyalty and good faith, unjust enrichment, conversion, and fraud, The Company Store and/or Domestications would have terminated their respective agreements as of the date of such breach.

155. Accordingly, Counterclaimant is entitled to a declaratory judgment declaring that The Company Store and/or the Domestications Agreement are void as of the date of such breach and, therefore, all compensation paid to ITC by Counterclaimant and vendors as of the date of such breach must be returned to Counterclaimant.

**WHEREFORE**, Counterclaimants demand as follows:

a) Compensatory, consequential, and punitive damages in an amount to be determined at trial;

b) Disgorgement and return of all compensation paid to Plaintiff by Counterclaimant The Company Store during the period of disloyalty;

c) Disgorgement and return of all compensation paid to Plaintiff by Counterclaimant Domestications during the period of disloyalty;

d) Disgorgement and return of all compensation paid to Plaintiff by Counterclaimants The Company Store and Domestication to Hanover during the period of disloyalty;

e) Disgorgement and return of all payments to The Company Store received by Plaintiff ITC from the vendors;

f) Disgorgement and return of all payments to Domestications received by Plaintiff ITC from the vendors;

g) Disgorgement and return of all payments to Hanover received by Plaintiff ITC from the vendors;

h) Declaratory judgment in favor of The Company Store that The Company Store Agreement is void as of the date of Plaintiff ITC's breach and all compensation paid by Counterclaimant and vendors be returned to Counterclaimant The Company Store;

i) Declaratory judgment in favor of Domestications that the Domestications Agreement is void as of the date of Plaintiff ITC's breach and all compensation paid by Counterclaimant and vendors be returned to Counterclaimant Domestications;

j) Declaratory judgment in favor of Hanover that The Company Store Agreement and/or the Domestications Agreement are void as of the date of Plaintiff ITC's breach and all compensation paid by Counterclaimants and vendors be returned to Counterclaimant Hanover;

k) Dismissal of ITC's Complaint;

l) Awarding Counterclaimants/Defendants prejudgment interest;

m) Awarding Counterclaimants/Defendants attorneys' fees, litigation expenses, and costs of suit; and

n) Granting other such relief as the Court may deem just and proper.

Dated: New York, New York
October 1, 2007

Law Offices of Eric Franz, P.L.L.C
Attorneys for Defendants

By: _____
Eric Franz (EF 3268)

36

**EXHIBIT A**

## RESTATED BUYING AGENCY AGREEMENT

This shall serve as the **Restated Buying Agency Agreement** dated as of June 15, 2004 ("**Agreement**"), by and between Hanover Company Store, LLC, a Delaware limited liability company with an office at 1500 Harbor Boulevard, Weehawken, New Jersey 07086 (referred to herein as "**The Company Store**") and Indo Trade Corp. LTD. a Limited Liability company duly formed and existing under the laws of Hong Kong, with its registered office at 10A, Seapower Industrial Centre, 177 Hoi Bun Road, Kwun Tong, Kowloon, Hong Kong (the "**Buying Agent**").

WHEREAS, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and *is consistent with,* and fully reflects, any and all prior or contemporaneous oral and written agreements and understandings relating to the subject matter hereof; and

WHEREAS, The Company Store imports certain merchandise into the United States for resale; and

WHEREAS, the Buying Agent is an established agent for such merchandise in India and China (the "**Market**"); and

WHEREAS, The Company Store desires to use the services of the Buying Agent upon the terms and subject to the conditions set forth; and

WHEREAS, the Buying Agent is willing to enter into this relationship with The Company Store upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, the parties hereto agree as follows;

1.      **Relationship.** The Company Store agrees to and does hereby intend to use the services of the Buying Agent, and the Buying Agent agrees to and does hereby accept such relationship with The Company Store, as hereinafter specified, for the term (as hereinafter defined). Buying Agent acknowledges that this Buying Agency Agreement is non-exclusive and that The Company Store may use other agents in the Market. ~~This Agreement does not preclude or prohibit The Company Store from purchasing merchandise directly from any of the factories with whom Buying Agent has placed orders on behalf of The Company Store.~~ *[intentionally omitted]* Nothing contained herein shall be construed to constitute Buying Agent as a partner, joint venturer or employee of The Company Store or to permit a party hereto to bind the other in any respect.

2.      **Scope of Services.**  (a) Buying Agent agrees to use its best efforts in its performance of all services ordinarily performed by buying agents and representatives abroad. Accordingly, Buying Agent agrees to provide general marketing services including reports on market conditions, special merchandise offerings on style and fashion trends, as well as procuring special samples, assistance to buyers visiting all foreign markets; consultation with manufacturers to assure proper manufacturing and delivery of merchandise against outstanding orders, but not limited to customs import and export documentation in connection therewith; performance of quality inspections at the factories while the merchandise is in production to ensure compliance with the manufacturing specifications of The Company Store, inspection of merchandise before shipment to verify that merchandise meets specifications, quality of packaging as required by The Company Store, handling and coordination of claims; and, all other functions normally expected to be performed by a buying agent. Buying Agent represents and warrants to The Company Store that it will fully and faithfully act as agent of The Company Store in accordance with principles of agency law.

(b)  Upon receipt of orders from The Company Store for merchandise, which orders shall be

made either by email, wire, cable, letter, telex or overnight courier (the "**orders**"), the Buying Agent shall place orders for such merchandise and shall cause same to be shipped in accordance with the terms of the purchase order. The Buying Agent shall not cause anything to be purchased other than that merchandise specified by The Company Store in the purchase orders. If the orders are sent FOB, EXW, CFR, FAS, CIF, LDP, etc. such terms shall mean the manufacturers gross invoice amount less returns, allowances, cash and trade discounts, and any applicable freight and insurance, as determined by the purchase order.

(c) The Buying Agent shall inspect all shipments to ascertain that quality, workmanship and styling meet with the specifications and/or samples upon which each order is based. The Buying Agent shall then sign a "**Certificate of Inspection**" to insure such compliance, which Certificate of Inspection shall be signed by only either <u>Thomas Zacharias</u> or another authorized representative. The Buying Agent shall further endeavor to ensure timely delivery in accordance with the delivery dates recorded on the purchase orders and that the quantity shipped is in agreement with the quantity on the purchase orders. The Buying Agent shall endeavor to effect the return or the adjustment by reimbursement from suppliers or vendors of merchandise which is defective or is not shipped in accordance with samples or specifications.

(d) The Buying Agent shall forward copies of all shipping documents to The Company Store immediately after Buying Agent's execution thereof.

(e) The Buying Agent will arrange for the testing of all merchandise, at factory's expense, to determine such merchandise's compliance with United States laws. All such testing must be completed by an independent agency satisfactory to The Company Store and a written report, satisfactory to The Company Store, describing such results must be issued to The Company Store. The Buying Agent further represents and warrants that all merchandise delivered to The Company Store pursuant to this agreement will comport with United States laws and regulations.

3. **Term.** This written agreement reflects the understanding of the responsibilities and duties of the respective parties since the buying agency relationship between The Company Store and Buying Agent was established on or about **June, 1998.** The term of this agreement hereunder shall commence on the date hereof and shall terminate one year later and, absent the notice provided for below, shall automatically renew for successive one year periods (such period(s) being referred to herein as the "**term**"); provided, however, that this Buying Agency Agreement may be terminated by either party with or without cause upon giving ninety (90) days written notice prior to such intended cancellation. This Agreement became effective on the date of execution and ratifies any actions taken prior to the date hereof.

4. **Compensation.** (a) The Company Store shall pay to the Buying Agent, and the Buying Agent agrees to accept, in full consideration of its services, a commission equal to the following percentages of the FOB value of each shipment made pursuant to the terms hereof: (i) **5%** for soft goods; (ii) **6%** for rugs; and (iii) **10%** for hard goods. In no event will cash payments to the Buying Agent by The Company Store be made to or through the manufacturer. All such commissions shall be payable separately by The Company Store within 30 days after said merchandise being handed over to the freight forwarder designated by The Company Store. Buying Agent shall list its commission charge in the paperwork and/or electronic data that it forwards to The Company Store and/or its representatives for purposes of entering the subject merchandise into the United States. If the Buying Agent fails to list the commission charges as required by this agreement, The Company Store shall be permitted to withhold any commission due and payable under this Buying Agency Agreement until the Buying Agent delivers the correct paperwork in accordance with this agreement, and Buying Agent shall be responsible for all fines, levies, assessments and delays as a result of Buying Agent's failure to list such commission charges.

(b) In the event that a shipment released by the Buying Agent is not in accordance with

specifications or in breach of the "inspection of merchandise/shipment" or other clause of this Buying Agency Agreement, commissions due Buying Agent against that particular shipment may be forfeited by the Buying Agent, or withheld until satisfactory adjustment is made by the shipper, all at the discretion of The Company Store.

(c)  The Buying Agent agrees not to share any of the Buying Agent's commission paid to it by The Company Store with any manufacturer, either directly or indirectly.  Buying Agent further agrees not to accept any remuneration as the buying agent of The Company Store other than the Buying Agent's commission to be paid hereunder by The Company Store.

5.  **Payment for Orders.**  All purchase orders and payments shall be denominated and payable in United States Dollars.

6.  **Indemnification.**  *[Intentionally omitted.]*

7.  **Miscellaneous.**  (a)  No Control.  Buying Agent represents and warrants to The Company Store that it has no ownership or financial interest in, nor does it exercise any control of the factories making the commodities purchased with the assistance of the Buying Agent and that none of the factories have any ownership or financial interest whatsoever in, nor do any of them exercise control over Buying Agent; and that it does not in the ordinary course of business maintain an inventory of merchandise, but only orders merchandise for The Company Store in accordance with instructions given by The Company Store.

(b)  Invoices.  Buying Agent shall retain and provide to The Company Store upon request evidence in the form of invoices and other receipts from the manufacturer of the merchandise, to verify the amounts shown on export invoices or other expenses disbursed for the account of The Company Store on ex-factory purchases.

(c)  Books and Records.  All books, records, correspondence and data pertaining to the conduct of Buying Agent's business for The Company Store shall be deemed to be Buying Agent's property and shall at times be available to The Company Store.  Buying Agent agrees it will at all times keep in strictest confidence and will not use or disclose any information obtained as a direct result of this Buying Agency Agreement.  Buying Agent hereby agrees, for a period of six years from the date of each shipment of goods, to keep and maintain all import related documents, including the Manufacturer's invoices referred to in Section 7(b) hereof.

(d)  Confidentiality.  Each party, in performing its obligations under this Agreement, may have access to or be exposed to, directly and indirectly, information, knowledge and proprietary and trade secret information of the other party in oral, graphic, written, electronic or machine readable form (collectively referred to as "**Confidential Information**").   Confidential Information shall not include information which can be demonstrated: (a) to have been rightfully in the possession of a party from a source other than the other party prior to the time of disclosure of said information to such party ("**Time of Receipt**"); (b) to have been in the public domain prior to the Time of Receipt; (c) to have become part of the public domain after the Time of Receipt by a publication or by any other means, except an unauthorized act or omission or breach of this Agreement on the part of a party, its employees, or agents; or (d) to have been supplied to a party after the Time of Receipt by a third party who is under no obligation to a party to maintain such information in confidence.  The parties (including their officers, directors, shareholders, affiliates, agents, employees, consultants, other representatives, successors and assigns) agree that all confidential or proprietary information, including, without limitation, designs, drawings, graphics, schematics, marketing plans, cost schedules, shipping schedules and other related data and pricing, fulfillment and other operational information, received by each as a result of this Agreement shall be held and maintained in strictest confidence, and shall not be disclosed to anyone other than employees or agents of the respective parties whose duties require access to such information or used by a party without express written consent of the other party, except as may be required by law.  The parties further

agree that any public statements made by either party concerning this Agreement, unless required by law, shall require prior written approval of the other party. Each party shall use reasonable measures and reasonable efforts to provide protection for such confidential information of the other party, including measures at least as strict as those a party uses to protect its own Confidential Information.

(e) Product Designs. All designs of products developed or to be developed for The Company Store shall remain the exclusive property of The Company Store and be deemed Confidential Information. Buying Agent warrants and covenants that it will execute all necessary documentation to transfer and/or support such property rights to The Company Store, and that Buying Agent will obtain the execution of such documentation, as required, from the appropriate manufacturer and designer. Buying Agent warrants that it will not sell, license or otherwise distribute such products to any other party, and Buying Agent will also obtain similar such warranty from the manufacturer and designer.

(f) Governing Law. This Buying Agency Agreement shall be construed in accordance with the laws of the State of New York. The Buying Agent hereby agrees to submit to the jurisdiction and venue of the federal and state courts of the State of New York.

(g) Assignment. This Buying Agency Agreement shall inure to the benefit of, and be binding upon, the parties hereto, their respective heirs, successors and assigns.

(h) Amendment. No provision of this Buying Agency Agreement may be amended, modified or waived unless such amendment, modification or waiver shall be agreed to in writing and signed by the parties hereto.

(i) Assignment. This Buying Agency Agreement shall not be assignable by either party (except that The Company Store may assign this agreement to its affiliate), and nothing herein is intended to confer upon any person, other than the parties hereto, any rights or remedies or defenses under or by reason of this Buying Agency Agreement. This Buying Agency Agreement shall inure to the benefit of, and be binding upon, the parties hereto, their respective heirs, successors and assigns.

(j) Notices. All notices, payments or other communications under this Buying Agency Agreement will be in the English language, in writing and will be by first class mail, postage prepaid (airmail, if international) or by cable, telex or similar transmissions, with confirmed answer back:

If to The Company Store:    Hanover Company Store, LLC
1500 Harbor Boulevard
Weehawken, New Jersey 07086, U.S.A.
Attn: Sylvia Lipman, Director – Inventory Control

If to Buying Agent:    (1) Indo Trade Corp. Ltd.
B-147 Sector 6
Noida 201301, India
Attn: Neera Waldman, CEO
and
(2) Indo Trade Corp. Ltd.
10A, Seapower Industrial Centre
177 Hoi Bun Road
Kwun Tong, Kowloon, Hong Kong
Attn: Neera Waldman, CEO
Phone: 852-2345-7555
Fax: 852-2357-5666
Neera@waldmanco.com

(k) Captions. All headings in this Buying Agency Agreement are for convenience only and are not intended to affect the meaning of any provision hereof.

(l) Severability. Should any provision of this Buying Agency Agreement not be enforceable or prohibited by an applicable law, then this Buying Agency Agreement shall be considered divisible as to such provision which shall be inoperative, and the remainder of the Buying Agency Agreement shall be valid and binding as though such provision were not included herein.

(m) Buying Agent hereby acknowledges that the obligations of this Buying Agency Agreement, including but not limited to the exclusivity or non-exclusivity provisions of Section 1 hereof, applies only to The Company Store and not to any other catalog, division or affiliate of Hanover Direct, Inc. or its affiliates.

(n) Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument.

IN WITNESS WHEREOF, the parties have executed this Buying Agency Agreement as of the last date set forth below.

HANOVER COMPANY STORE, LLC, on behalf of
The Company Store®

By: _____
Name: _John DiFrancisco_
Title: _President_
Date: _6 - 23 ___, 2004

INDO TRADE CORPORATION

By: _____
Name: NEERA WALDMAN
Title: CEO
Date: 23rd JUNE ___, 2004

# EXHIBIT B

## RESTATED BUYING AGENCY AGREEMENT

This shall serve as the **Restated Buying Agency Agreement** dated as of June 15, 2004 (**"Agreement"**), by and between Domestications, LLC, a Delaware limited liability company with an office at 1500 Harbor Boulevard, Weehawken, New Jersey 07086 (referred to herein as **"Domestications"**) and Indo Trade Corp., LTD. a Limited Liability company duly formed and existing under the laws of Hong Kong, with its registered office at 10A, Seapower Industrial Centre, 177 Hoi Bun Road, Kwun Tong, Kowloon, Hong Kong (the **"Buying Agent"**).

WHEREAS, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and *is consistent with,* and fully reflects, any and all prior or contemporaneous oral and written agreements and understandings relating to the subject matter hereof; and

WHEREAS, Domestications imports certain merchandise into the United States for resale; and

WHEREAS, the Buying Agent is an established agent for such merchandise in China (the **"Market"**); and

WHEREAS, Domestications desires to use the services of the Buying Agent upon the terms and subject to the conditions set forth; and

WHEREAS, the Buying Agent is willing to enter into this relationship with Domestications upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, the parties hereto agree as follows;

1.    **Relationship.** Domestications agrees to and does hereby intend to use the services of the Buying Agent, and the Buying Agent agrees to and does hereby accept such relationship with Domestications, as hereinafter specified, for the term (as hereinafter defined). Buying Agent acknowledges that this Buying Agency Agreement is non-exclusive and that Domestications may use other agents in the Market. ~~This Agreement does not preclude or prohibit Domestications from purchasing merchandise directly from any of the factories with whom Buying Agent has placed orders on behalf of Domestications.~~ *[intentionally omitted]* Nothing contained herein shall be construed to constitute Buying Agent as a partner, joint venturer or employee of Domestications or to permit a party hereto to bind the other in any respect.

2.    **Scope of Services.**    (a) Buying Agent agrees to use its best efforts in its performance of all services ordinarily performed by buying agents and representatives abroad. Accordingly, Buying Agent agrees to provide general marketing services including reports on market conditions, special merchandise offerings on style and fashion trends, as well as procuring special samples, assistance to buyers visiting all foreign markets; consultation with manufacturers to assure proper manufacturing and delivery of merchandise against outstanding orders, but not limited to customs import and export documentation in connection therewith; performance of quality inspections at the factories while the merchandise is in production to ensure compliance with the manufacturing specifications of Domestications, inspection of merchandise before shipment to verify that merchandise meets specifications, quality of packaging as required by Domestications, handling and coordination of claims; and, all other functions normally expected to be performed by a buying agent. Buying Agent represents and warrants to Domestications that it will fully and faithfully act as agent of Domestications in accordance with principles of agency law.

(b)    Upon receipt of orders from Domestications for merchandise, which orders shall be made either by email, wire, cable, letter, telex or overnight courier (the **"orders"**), the Buying Agent shall place orders for such merchandise and shall cause same to be shipped in accordance with the terms of the

purchase order. The Buying Agent shall not cause anything to be purchased other than that merchandise specified by Domestications in the purchase orders. If the orders are sent FOB, EXW, CFR, FAS, CIF, LDP, etc. such terms shall mean the manufacturers gross invoice amount less returns, allowances, cash and trade discounts, and any applicable freight and insurance, as determined by the purchase order.

(c) The Buying Agent shall inspect all shipments to ascertain that quality, workmanship and styling meet with the specifications and/or samples upon which each order is based. The Buying Agent shall then sign a "Certificate of Inspection" to insure such compliance, which Certificate of Inspection shall be signed by only either **Thomas Zacharias** or another authorized representative. The Buying Agent shall further endeavor to ensure timely delivery in accordance with the delivery dates recorded on the purchase orders and that the quantity shipped is in agreement with the quantity on the purchase orders. The Buying Agent shall endeavor to effect the return or the adjustment by reimbursement from suppliers or vendors of merchandise which is defective or is not shipped in accordance with samples or specifications.

(d) The Buying Agent shall forward copies of all shipping documents to Domestications immediately after Buying Agent's execution thereof.

(e) The Buying Agent will arrange for the testing of all merchandise, at factory's expense, to determine such merchandise's compliance with United States laws. All such testing must be completed by an independent agency satisfactory to Domestications and a written report, satisfactory to Domestications, describing such results must be issued to Domestications. The Buying Agent further represents and warrants that all merchandise delivered to Domestications pursuant to this agreement will comport with United States laws and regulations.

3. **Term.** This written agreement reflects the understanding of the responsibilities and duties of the respective parties since the buying agency relationship between Domestications and Buying Agent was established on or about **January, 2004.** The term of this agreement hereunder shall commence on the date hereof and shall terminate one year later and, absent the notice provided for below, shall automatically renew for successive one year periods (such period(s) being referred to herein as the **"term"**); provided, however, that this Buying Agency Agreement may be terminated by either party with or without cause upon giving ninety (90) days written notice prior to such intended cancellation. This Agreement became effective on the date of execution and ratifies any actions taken prior to the date hereof.

4. **Compensation.** (a) Domestications shall pay to the Buying Agent, and the Buying Agent agrees to accept, in full consideration of its services, a commission equal to the following percentages of the FOB value of each shipment made pursuant to the terms hereof: ~~four~~ (4%) percent. In no event will cash payments to the Buying Agent by Domestications be made to or through the manufacturer. All such commissions shall be payable separately by Domestications within 30 days after said merchandise being handed over to the freight forwarder designated by Domestications. Buying Agent shall list its commission charge in the paperwork and/or electronic data that it forwards to Domestications and/or its representatives for purposes of entering the subject merchandise into the United States. If the Buying Agent fails to list the commission charges as required by this agreement, Domestications shall be permitted to withhold any commission due and payable under this Buying Agency Agreement until the Buying Agent delivers the correct paperwork in accordance with this agreement, and Buying Agent shall be responsible for all fines, levies, assessments and delays as a result of Buying Agent's failure to list such commission charges.

(b) In the event that a shipment released by the Buying Agent is not in accordance with specifications or in breach of the "inspection of merchandise/shipment" or other clause of this Buying Agency Agreement, commissions due Buying Agent against that particular shipment may be forfeited by the Buying Agent, or withheld until satisfactory adjustment is made by the shipper, all at the discretion of

HDINT-PA/I/legal/TCS/Buy-Agent-Indo-Dom-062904

Domestications.

(c)  The Buying Agent agrees not to share any of the Buying Agent's commission paid to it by Domestications with any manufacturer, either directly or indirectly.  Buying Agent further agrees not to accept any remuneration as the buying agent of Domestications other than the Buying Agent's commission to be paid hereunder by Domestications.

5.  **Payment for Orders.**  All purchase orders and payments shall be denominated and payable in United States Dollars.

6.  **Indemnification.**  *[Intentionally omitted.]*

7.  **Miscellaneous.**  (a)  No Control.  Buying Agent represents and warrants to Domestications that it has no ownership or financial interest in, nor does it exercise any control of the factories making the commodities purchased with the assistance of the Buying Agent and that none of the factories have any ownership or financial interest whatsoever in, nor do any of them exercise control over Buying Agent; and that it does not in the ordinary course of business maintain an inventory of merchandise, but only orders merchandise for Domestications in accordance with instructions given by Domestications.

(b)  Invoices.  Buying Agent shall retain and provide to Domestications upon request evidence in the form of invoices and other receipts from the manufacturer of the merchandise, to verify the amounts shown on export invoices or other expenses disbursed for the account of Domestications on ex-factory purchases.

(c)  Books and Records.  All books, records, correspondence and data pertaining to the conduct of Buying Agent's business for Domestications shall be deemed to be Buying Agent's property and shall at times be available to Domestications.  Buying Agent agrees it will at all times keep in strictest confidence and will not use or disclose any information obtained as a direct result of this Buying Agency Agreement.  Buying Agent hereby agrees, for a period of six years from the date of each shipment of goods, to keep and maintain all import related documents, including the Manufacturer's invoices referred to in Section 7(b) hereof.

(d)  Confidentiality.  Each party, in performing its obligations under this Agreement, may have access to or be exposed to, directly and indirectly, information, knowledge and proprietary and trade secret information of the other party in oral, graphic, written, electronic or machine readable form (collectively referred to as "**Confidential Information**").  Confidential Information shall not include information which can be demonstrated: (a) to have been rightfully in the possession of a party from a source other than the other party prior to the time of disclosure of said information to such party ("**Time of Receipt**"); (b) to have been in the public domain prior to the Time of Receipt; (c) to have become part of the public domain after the Time of Receipt by a publication or by any other means except an unauthorized act or omission or breach of this Agreement on the part of a party, its employees, or agents; or (d) to have been supplied to a party after the Time of Receipt by a third party who is under no obligation to a party to maintain such information in confidence.  The parties (including their officers, directors, shareholders, affiliates, agents, employees, consultants, other representatives, successors and assigns) agree that all confidential or proprietary information, including, without limitation, designs, drawings, graphics, schematics, marketing plans, cost schedules, shipping schedules and other related data and pricing, fulfillment and other operational information, received by each as a result of this Agreement shall be held and maintained in strictest confidence, and shall not be disclosed to anyone other than employees or agents of the respective parties whose duties require access to such information or used by a party without express written consent of the other party, except as may be required by law.  The parties further agree that any public statements made by either party concerning this Agreement, unless required by law, shall require prior written approval of the other party.  Each party shall use reasonable measures and reasonable efforts to provide protection for such confidential information of the other party, including

measures at least as strict as those a party uses to protect its own Confidential Information.

(e) Product Designs. All designs of products developed or to be developed for Domestications shall remain the exclusive property of Domestications and be deemed Confidential Information. Buying Agent warrants and covenants that it will execute all necessary documentation to transfer and/or support such property rights to Domestications, and that Buying Agent will obtain the execution of such documentation, as required, from the appropriate manufacturer and designer. Buying Agent warrants that it will not sell, license or otherwise distribute such products to any other party, and Buying Agent will also obtain similar such warranty from the manufacturer and designer.

(f) Governing Law. This Buying Agency Agreement shall be construed in accordance with the laws of the State of New York. The Buying Agent hereby agrees to submit to the jurisdiction and venue of the federal and state courts of the State of New York.

(g) Assignment. This Buying Agency Agreement shall inure to the benefit of, and be binding upon, the parties hereto, their respective heirs, successors and assigns.

(h) Amendment. No provision of this Buying Agency Agreement may be amended, modified or waived unless such amendment, modification or waiver shall be agreed to in writing and signed by the parties hereto.

(i) Assignment. This Buying Agency Agreement shall not be assignable by either party (except that Domestications may assign this agreement to its affiliate), and nothing herein is intended to confer upon any person, other than the parties hereto, any rights or remedies or defenses under or by reason of this Buying Agency Agreement. This Buying Agency Agreement shall inure to the benefit of, and be binding upon, the parties hereto, their respective heirs, successors and assigns.

(j) Notices. All notices, payments or other communications under this Buying Agency Agreement will be in the English language, in writing and will be by first class mail, postage prepaid (airmail, if international) or by cable, telex or similar transmissions, with confirmed answer back:

If to Domestications:
Domestications, LLC
1500 Harbor Boulevard
Weehawken, New Jersey 07086, U.S.A.
Attn: Gina Pulzello, VP Inventory

If to Buying Agent:
(1) Indo Trade Corp. Ltd.
B-147 Sector 6
Noida 201301, India
Attn: Neera Waldman, CEO
and
(2) Indo Trade Corp. Ltd.
10A, Seapower Industrial Centre
177 Hoi Bun Road
Kwun Tong, Kowloon, Hong Kong
Attn: Neera Waldman, CEO
Phone: 852-2345-7555
Fax: 852-2357-5666
Neera@waldmanco.com

(k) Captions. All headings in this Buying Agency Agreement are for convenience only and are not intended to affect the meaning of any provision hereof.

HDINT-PA/i/legal/TCS/Buy-Agent-Indo-Dom-062904

4

(l) <u>Severability.</u>  Should any provision of this Buying Agency Agreement not be enforceable or prohibited by an applicable law, then this Buying Agency Agreement shall be considered divisible as to such provision which shall be inoperative, and the remainder of the Buying Agency Agreement shall be valid and binding as though such provision were not included herein.

(m)  Buying Agent hereby acknowledges that the obligations of this Buying Agency Agreement, including but not limited to the exclusivity or non-exclusivity provisions of Section 1 hereof, applies only to Domestications and not to any other catalog, division or affiliate of Hanover Direct, Inc. or its affiliates.

(n) <u>Counterparts.</u>  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument.

IN WITNESS WHEREOF, the parties have executed this Buying Agency Agreement as of the last date set forth below.

DOMESTICATIONS, LLC, on behalf of
Domestications®

By: _____
Name: _____
Title: _____
Date: _____, 2004

INDO TRADE CORPORATION

By: _Nina Waldman_____
Name:  NEERA  WALDMAN
Title:  CEO
Date:  29th  JUNE  , 2004

# EXHIBIT C

**Hanover**Direct
201 272 3405
Fax 201 272 3498

WAYEN P. GARTEN
President & CEO

September 15, 2006

By Fax, E-mail, and Confirmation by DHL Courier
Fax:  852-2357-5666
Neera@waldmanco.com
Joel@waldmanco.com

Indo Trade Corp. Ltd.
B-147 Sector 6
Noida 201301, India

Indo Trade Corp. Ltd
10A, Seapower Industrial Centre
177 Hoi Bun Road
Kwun Tong, Kowloon
Hong Kong

Attention:    Neera Waldman, CEO
              Joel Waldman

Dear Joel and Neera:

Following up on my September 7, 2006 discussion with Neera in my office and subsequent phone conversations with Joel, this letter shall confirm that HDI has terminated ITC's appointment as Agent for Domestications and The Company Store in India effective September 7, 2006.

We appreciate ITC's commitment to assist in a smooth transition. In that regard, ITC has agreed to continue to discharge its duties under the Restated Buying Agency Agreements for all outstanding orders and re-orders including quality and import tracking obligations. I understand that this process is well under way. We will be contacting all of our vendors and suppliers in India and informing them that ITC is no longer our Buying Agent.

As a follow up to my telephone conversation with Joel concerning securing samples from your Chinese office and some related payment issues, please be advised that we have cancelled the China L/C previously issued in ITC China's favor to pay vendor invoices and are in the process of reissuing L/C's in the names of the individual vendors. We appreciate your cooperation in making sure that there is a smooth transition to the new payment arrangements.

Please contact me if you have any questions concerning this matter.

Sincerely

Wayne Garten, CEO & President

cc:  Anita Iodice
     Charles Pellenberg

HANOVER DIRECT, INC. 1500 HARBOR BOULEVARD, WEEHAWKEN, NEW JERSEY 07086